UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
MIHAI ILINCA,

                    Plaintiff,

          -against-                        <u>MEMORANDUM & ORDER</u>
                                           13-CV-3500(JS)(AYS)
BOARD OF COOPERATIVE EDUCATIONAL
SERVICES OF NASSAU,

                    Defendant.
----------------------------------x
APPEARANCES
For Plaintiff:          Kathleen Ann Tirelli, Esq.
                        Scott M. Mishkin, Esq.
                        Scott Michael Mishkin, P.C.
                        One Suffolk Square, Suite 520
                        Islandia, NY 11749

For Defendant:          Lewis R. Silverman, Esq.
                        Samantha Velez, Esq.
                        Rutherford & Christie LLP
                        369 Lexington Avenue, 8th Floor
                        New York, NY 10017

                        Gerald Stephen Smith, Esq.
                        Silverman and Associates
                        445 Hamilton Avenue, Suite 1102
                        White Plains, NY 10601

SEYBERT, District Judge:

          Plaintiff Mihai Ilinca ("Plaintiff") commenced this

action against the Board of Cooperative Educational Services of

Nassau ("Defendant" or "BOCES"), asserting claims for sexual

harassment and retaliation under Title VII of the Civil Rights Act

of 1964 as amended, 42 U.S.C. §§ 2000 <u>et. seq.</u> ("Title VII"), and

a claim for retaliation under the Family and Medical Leave Act, 29

U.S.C. §§ 2611 <u>et. seq.</u> ("FMLA").  Presently pending before the

Court is Defendant's motion for summary judgment. (Def.'s Mot., Docket Entry 83.) For the following reasons, Defendant's motion is GRANTED.

Plaintiff began working as a bus driver at BOCES in 2000. (Def.'s 56.1 Stmt., Docket Entry 77, ¶ 1.) In or about 2009, Plaintiff began reporting to Safety Coordinator Louise Flynn ("Flynn"). (Def.'s 56.1 Stmt. ¶ 4.) Plaintiff also began reporting to Lisa Rice ("Rice") when she became his supervisor in 2010. (Def's 56.1 Stmt. ¶ 2.) Plaintiff alleges that he verbally complained to Rice that Flynn was sexually harassing him in or about April 2011. (Pl.'s 56.1 Counterstmt., Docket Entry 78, ¶ 97.)

A. June 2011 Bus Incident

Defendant alleges that on or about June 9, 2011, Rice asked Plaintiff to switch buses with a driver who was having difficulties with a bus's directional signals. (Def.'s 56.1 Stmt. ¶¶ 13-14.) Plaintiff disputes that allegation, and avers that he was asked to exchange his bus with another driver's defective bus that did not have lights or signal lights and drive it to "Transportation." (Pl.'s 56.1 Counterstmt. ¶¶ 13-14.) Defendant

---

[1] The following material facts are drawn from Defendant's Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

alleges that Rice asked Plaintiff to exchange buses because he was the closest driver to the other bus. (Def.'s 56.1 Stmt. ¶ 15.) Plaintiff alleges that Rice asked him to drive the defective bus because of his sexual harassment complaints. (Pl.'s 56.1 Counterstmt. ¶ 15.)

Plaintiff arrived at the location of the other driver's bus and refused to drive that bus because it was unsafe. (Def.'s 56.1 Stmt. ¶ 16.) Defendant alleges that "Plaintiff's supervisor" told him that he did not have to drive the bus to the yard. (Def.'s 56.1 Stmt. ¶ 17.) Plaintiff alleges that he was not told he was not required to return the bus and he ultimately told Rice "he was turning his radio off because he could not stand the stress of being demanded to drive the dangerous bus." (Pl.'s 56.1 Counterstmt. ¶ 17.) The parties do not dispute that a mechanic was dispatched with an additional bus and another employee drove the bus that Plaintiff believed was unsafe. (Def.'s 56.1 Stmt. ¶¶ 18-19.)

B. Sexual Harassment Complaints

After the June 2011 bus incident, Plaintiff gave his union representative two letters and was informed that these letters were delivered to Joan Siegel ("Siegel"), Associate Superintendent for Business Services. (Def.'s 56.1 Stmt. ¶¶ 20, 35.) One letter detailed his disagreement regarding the bus, and the other set forth allegations of sexual harassment by Flynn.

(Def.'s 56.1 Stmt. ¶¶ 21-22.)  Plaintiff's letter stated that Flynn referred to him as "skinny boy," and told Plaintiff that she could access employees' evaluation histories and he could view his evaluation history on her computer if he desired to.  (Def.'s 56.1 Stmt. ¶ 23.)

Thereafter, Plaintiff attended a meeting with Siegel and Flynn where his sexual harassment allegations were discussed. (Def.'s 56.1 Stmt. ¶¶ 24-25.)  The parties dispute whether Rice was also present at the meeting.  (Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Counterstmt. ¶ 24.)  Siegel advised that Flynn would no longer observe or evaluate Plaintiff without another supervisor present. (Def.'s 56.1 Stmt. ¶ 29.)

Flynn did not make any inappropriate comments to Plaintiff following this meeting.  (Def.'s 56.1 Stmt. ¶ 27.) However, Plaintiff alleges that "Flynn followed him around many times after he complained of sexual harassment, but did not always ask him to sign a report."  (Pl.'s 56.1 Counterstmt. ¶ 30.)

Plaintiff alleges that he submitted an additional complaint to Monica Berkowitz[2] on June 14, 2011, regarding retaliation by Rice.  (Pl.'s 56.1 Counterstmt. ¶ 99.)

---

[2] The record indicates that Monica Berkowitz was President of CSEA Nassau Educational, Local 865.  (Defs.' Ex. Y, Dep. Tr., Docket Entry 85-27, 2:20.)

On August 24, 2011, Plaintiff submitted a sexual harassment complaint to BOCES but alleges that the Sexual Harassment Complaint Form "was completed and signed by another individual." (Pl.'s 56.1 Counterstmt. ¶ 32.) Plaintiff's Sexual Harassment Complaint Form states that Plaintiff believed that "the previous sexual harassment matter had been resolved following a discussion with Joan Siegel." (Def.'s 56.1 Stmt. ¶¶ 32-33.) However, in that form, Plaintiff also requested that "the actions [ ] be stopped" and he be "treated with respect." (Def.'s 56.1 Stmt. ¶ 34.)

Subsequently, Flynn met with Siegel, Executive Director of Human Services Jeffrey Drucker ("Drucker"), and her union representative. (Def.'s 56.1 Stmt. ¶ 35.) Flynn was "directed to cease using terms that had been identified by Plaintiff and to be mindful of her action towards Plaintiff." (Def.'s 56.1 Stmt. ¶ 35.) A letter memorializing this directive was placed in Flynn's file. (Def.'s 56.1 Stmt. ¶ 36.)

C.   September 2011 Bus Route Incident

In or about September 2011, Head Dispatcher Rachel Blackman ("Blackman") received complaints from parents that the students on Plaintiff's bus route were being picked up late. (Def.'s 56.1 Stmt. ¶¶ 42, 48.) Blackman questioned Plaintiff about his route and Plaintiff's supervisors reviewed his GPS device to confirm his arrival times and routes. (Def.'s 56.1 Stmt. ¶¶ 43-

44.)  Defendant alleges that it determined Plaintiff needed to take the "most" efficient route via the Southern State Parkway (the "Parkway").  (Def.'s 56.1 Stmt. ¶ 45.)  Plaintiff disputes that the Parkway is the "most efficient" route and alleges that he was concerned about "increased chances of getting into an accident" on the highway. (Pl.'s 56.1 Counterstmt. ¶ 45.)  Defendant alleges that Plaintiff refused to drive on the Parkway and raised his voice at Blackman.  (Def.'s 56.1 Stmt. ¶¶ 49-50.)  Plaintiff alleges that he took the Parkway after "voic[ing] his disagreement with that decision." (Pl.'s 56.1 Counterstmt. ¶ 49.)  Blackman reported this incident to Rice.  (Def.'s 56.1 Stmt. ¶ 53.)  On September 11, 2011, Plaintiff attended a meeting with Rice and Lori Rowcroft ("Rowcroft")[3]; the parties dispute whether Plaintiff's union representative was present.  (Def.'s 56.1 Stmt. ¶ 54; Pl.'s 56.1 Counterstmt. ¶ 54.)

D.  Random Drug Test

In or about October 2011, Plaintiff was directed to take a random drug test.  (Def.'s 56.1 Stmt. ¶ 56.)  Plaintiff was permitted to take the test in a mobile location outside of the office without female employees observing him.  (Def.'s 56.1 Stmt. ¶ 57.)  However, Plaintiff alleges that "when it was his turn to

---

[3] The record indicates that Rowcroft was Senior Manager II, Transportation Supervisor at BOCES.  (Rowcroft's Tr., Def.'s Ex. P, Docket Entry 85-18, 43:8-11.)

have his urine test, Louise Flynn came out of the office and notified Plaintiff that she had to watch him for his urine test." (Pl.'s 56.1 Counterstmt. ¶ 59.)

E.    February 2012 Meeting

In February 2012, Plaintiff requested that his union representative arrange a meeting with Drucker to discuss his harassment allegations. (Def.'s 56.1 Stmt. ¶ 60.) Plaintiff alleges that on February 27, 2012, he prepared a letter "expressing his dissatisfaction with the way his complaints [we]re not being dealt with" and requesting an impartial investigation of his complaints against Flynn. (Pl.'s 56.1 Counterstmt. ¶¶ 102-103.)

On February 27, 2012, a meeting took place and Plaintiff was "informed that Ms. Flynn had previously been counseled regarding how she should interact with Plaintiff." (Def.'s 56.1 Stmt. ¶¶ 61-62.) Plaintiff alleges that at this meeting, he was advised that Flynn would continue to supervise him. (Pl.'s 56.1 Counterstmt. ¶ 104.) Subsequently, a letter dated February 29, 2012, was sent to Plaintiff, stating that: (1) Flynn had previously been "given a directive" regarding her workplace conduct, and (2) if Plaintiff believed that he was being subjected to retaliation, he should report it to the Department of Human Resources and/or his supervisors. (Def.'s 56.1 Stmt. ¶¶ 65-66.)

After the February 2012 meeting, Plaintiff was also informed that BOCES would be investigating his harassment

allegations. (Def.'s 56.1 Stmt. ¶ 67.) Defendant alleges that Plaintiff "refused to cooperate with that investigation." (Def.'s 56.1 Stmt. ¶ 68.) Plaintiff alleges that BOCES did not allow his union access to BOCES employees or records, and "[w]hen Plaintiff realized that the investigators were BOCES' own hired attorneys and paid by BOCES, he realized that it would not be a fair investigation, and then decided he was not interested in participating." (Pl.'s 56.1 Counterstmt. ¶¶ 68-69.) Nevertheless, BOCES proceeded with its investigation and provided Plaintiff with a report of its findings that his allegations of ongoing sexual harassment were unsubstantiated. (Def.'s 56.1 Stmt. ¶¶ 70-72.)

F.    July 2012 Bus Incident

In or about July 2012, a student on Plaintiff's bus had difficulty breathing. (Def.'s 56.1 Stmt. ¶ 73.) Defendant alleges that Plaintiff "informed his supervisors that the parent had previously told Plaintiff about the student's medical needs, however Plaintiff had never relayed that information to his supervisors until that day." (Def.'s 56.1 Stmt. ¶ 74.) Plaintiff disputes that allegation as "hollow." (Pl.'s 56.1 Counterstmt. ¶ 74.) Rowcroft reported this incident to Rice. (Def.'s 56.1 Stmt. ¶ 75.)

G.   Fasano Incident

Plaintiff alleges that in May 2012, he sought mental health assistance "due to the stress he experienced at work," and began treating with Margaret Fasano ("Fasano"), a nurse practitioner. (Pl.'s 56.1 Counterstmt. ¶¶ 105-106.)  In June 2012, Plaintiff took an approximately thirty-day medical leave as a result of "his mental stress issues at work."  (Pl.'s 56.1 Counterstmt. ¶ 107.)

In September 2012, Plaintiff owned two handguns that he was licensed to carry as concealed weapons.  (Def.'s 56.1 Stmt. ¶ 77.)  Defendant alleges that after Fasano's September 14, 2012, appointment with Plaintiff, she reported to the Nassau County Police Department (the "Police Department") that Plaintiff "had threatened his supervisors during their appointment, and had mentioned that he owned guns."  (Def.'s 56.1 Stmt. ¶ 79.)  Plaintiff concedes that Fasano contacted the Police Department, but denies that Fasano reported that Plaintiff threatened his supervisors.  (Pl.'s 56.1 Counterstmt. ¶ 79.)  Fasano's records state that Plaintiff indicated that owns "two Glocks" and he felt his supervisors "were out to get him" and that he "should take matters into [his] own hands."  (Def.'s 56.1 Stmt. ¶¶ 81-82.)

The Police Department requested that Plaintiff surrender his weapons pending their investigation into Fasano's allegations.

(Def.'s 56.1 Stmt. ¶ 83.)  Plaintiff surrendered his handguns on or about September 14, 2012.  (Def.'s 56.1 Stmt. ¶ 84.)

The Police Department contacted Rice and advised that they had received a report about Plaintiff's threats.  (Def.'s 56.1 Stmt. ¶ 85.)  Defendant alleges that Rice advised Drucker and Siegel of this information.  (Def.'s 56.1 Stmt. ¶ 86.)  Plaintiff alleges that "[i]t was BOCES that called Ms. Fasano and informed her that Plaintiff was threatening them with his weapons, and coerced her to call the police."  (Pl.'s 56.1 Counterstmt. ¶ 111.)

Drucker contacted the Police Department and advised Plaintiff that he was being placed on administrative leave.  (Def.'s 56.1 Stmt. ¶ 88.)  Defendant also placed a guard at a gate entrance, required employees to show identification prior to entering, and installed a panic button in Rice's office.  (Def.'s 56.1 Stmt. ¶ 89.)  Police officers were stationed around the perimeter of the property.  (Def.'s 56.1 Stmt. ¶ 89.)

Plaintiff alleges that he was hospitalized on September 21, 2012.  (Pl.'s 56.1 Counterstmt. ¶ 115.)  Plaintiff avers that Defendant directed him to a psychiatric examination, which took place on November 9, 2012, with Dr. Allen Reichman.  (Pl.'s 56.1 Counterstmt. ¶ 117.)  Plaintiff alleges that Dr. Reichman found no evidence of mental illness and determined that Plaintiff was fit to perform his duties at BOCES.  (Pl.'s 56.1 Counterstmt. ¶¶ 118-19.)  Plaintiff further alleges that on January 2, 2013, Rice sent

an email to Siegel and Drucker in which she asked them to "continue to pursue the idea of finding Plaintiff unfit to drive a bus." (Pl.'s 56.1 Counterstmt. ¶ 120.)

H.   Section 75 Hearing

On or about January 11, 2013, Plaintiff was referred for charges pursuant to New York Civil Service Law Section 75 (the "Section 75 Charges"). (Def.'s 56.1 Stmt. ¶ 90.) The Section 75 Charges included allegations that Plaintiff made a threatening statement, was insubordinate in refusing to drive his bus on the Parkway, and failed to report that a parent advised him of a student's medical needs. (Def.'s 56.1 Stmt. ¶¶ 91-92.) A hearing was held on four dates during early 2013 (the "Section 75 Hearing"). (Def.'s 56.1 Stmt. ¶ 93.) At the hearing's conclusion, Plaintiff was found guilty of five charges and the hearing officer recommended that Plaintiff's employment be terminated. (Def.'s 56.1 Stmt. ¶ 94.) On September 12, 2013, Plaintiff's employment was terminated. (Def.'s 56.1 Stmt. ¶ 95.) Plaintiff alleges that Defendant continues to retaliate against him by "discouraging prospective employers from hiring Plaintiff by stating that he is a danger." (Pl.'s 56.1 Counterstmt. ¶ 125.)

DISCUSSION

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

I.   Plaintiff's Affidavit

        Defendant argues that Plaintiff's Affidavit sworn to on
December 30, 2015, ("Plaintiff's Affidavit") should be stricken or
otherwise disregarded.[4]  (Def.'s Br., Docket Entry 84, at 22-24;
Pl.'s Aff., Docket Entry 82.)  Defendant alleges that Plaintiff's
Affidavit is improper because it contains unsupported assertions,
and allegations that constitute hearsay, are otherwise
inadmissible, and/or contradict Plaintiff's prior sworn testimony.
(Def.'s Br. at 22-23.)  Plaintiff counters that his Affidavit is
"based upon actual facts that are supported by documents and
testimony" and it does not contradict his prior deposition
testimony.  (Pl.'s Br., Docket Entry 87, at 18.)

        Federal Rule of Civil Procedure 56(d) provides that
affidavits or declarations used to oppose motions for summary
judgment "must be made on personal knowledge, set out facts that
would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters stated."  FED. R.
CIV. P. 56(c)(4).  Additionally, "a court may . . . strike portions
of an affidavit that are not based upon the affiant's personal
knowledge, contain inadmissible hearsay or make generalized and
conclusory statements."  Sandor v. Safe Horizon, Inc., No. 08-CV-

---

[4] The Court notes that Defendant's Notice of Motion does not
contain a request to strike Plaintiff's Affidavit.  (See Def.'s
Mot.)

4636, 2011 WL 115295, at *6 (E.D.N.Y. Jan. 13, 2011) (internal quotation marks and citation omitted; emphasis and ellipsis in original).  But see Isaacs v. Mid Am. Body & Equip. Co., 720 F. Supp. 255, 256 (E.D.N.Y. 1989) (the Court may consider hearsay on a motion for summary judgment where there is a "showing that admissible evidence will be available at trial").  Alternatively, the Court may decline to engage in a "line-by-line analysis" and disregard any portions of an affidavit that do not comply with Rule 56(c)(4).  Sandor, 2011 WL 115295, at *6.  Accord Serrano v. Cablevision Sys. Corp., 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012) ("[n]othing in the Federal Rules or case law requires a court to conduct a line-by-line review of a challenged affidavit").

The Court declines to engage in a line-by-line review of Plaintiff's Affidavit.  Instead, the Court will only consider Plaintiff's Affidavit to the extent that it asserts "facts that have been properly set-forth in accordance with the Federal Rules of Civil Procedure as well as the Local Rules." Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("rather than scrutinizing each line of each of the plaintiffs numerous affidavits and discussing whether they contain conclusory allegations, legal arguments, or hearsay and whether such hearsay may be categorized as a hearsay exception, the Court . . . will only consider relevant evidence that is admissible . . . .").

II.  <u>Hostile Work Environment</u>

The plaintiff states a Title VII hostile work environment claim by establishing that the conduct at issue: "(1) is objectively severe or pervasive, that is . . . the conduct creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." <u>La Grande v. DeCrescente Distr. Co., Inc.</u>, 370 F. App'x 206, 209 (2d Cir. 2010) (internal quotation marks and citation omitted; ellipsis in original). This standard necessitates both an objective and subjective inquiry as "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." <u>Littlejohn v. City of N.Y.</u>, 795 F.3d 297, 321 (2d Cir. 2015) (internal quotation marks and citation omitted).

To overcome summary judgment, the plaintiff must proffer evidence that his "workplace was so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of his employment were thereby altered." <u>Dall v. St. Catherine of Siena Med. Ctr.</u>, 966 F. Supp. 2d 167, 188-89 (E.D.N.Y. Aug. 14, 2013) (internal quotation marks and citation omitted). In determining whether a work environment is hostile,

the Court examines the totality of the circumstances, which include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Littlejohn, 795 F.3d at 321 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)). However, "limited, infrequent, and at worst, mildly offensive conduct," does not suffice to raise triable issues of fact regarding an objectively hostile work environment. Cristofaro v. Lake Shore Cent. Sch. Dist., 473 F. App'x 28, 30 (2d Cir. 2012).

Plaintiff's brief does not clearly articulate the particular actions that allegedly comprise the sexually hostile work environment. (See generally Pl.'s Br. at 9-12.) However, Plaintiff alleges that: (1) Flynn harassed him "via looks, and stares," (Pl.'s Br. at 6), and (2) Plaintiff was "singled out to drive a defective bus back to the station" and "asked to drive his bus on the Southern State Parkway even after he expressed his feelings that it jeopardized his safety," (Pl.'s Br. at 11). The record also indicates that Plaintiff alleges Flynn: (1) asked Plaintiff to "coach her how to work out, to exercise, what exercises to do, what techniques to employ [ ] because she wanted to get in shape," (Pl.'s Dep. Tr., Def.'s Ex. B, Docket Entries 85-2 through 85-4, 114:14-116:20, 117:23-119:22); (2) referred to

Plaintiff as "skinny boy" and remarked on his "sexy legs,"[5] (Defs.'
56.1 Stmt. ¶ 23; Pl.'s Dep. Tr. 113:24-114:7); (3) looked at
Plaintiff's groin while "briefly" reviewing his evaluation, and
called Plaintiff next to her and showed him that she could view
his employee evaluation history on her computer, (Pl.'s 56.1
Counterstmt. ¶ 23, Pl.'s Dep. Tr. 191:21-194:7); (4) "followed
[Plaintiff] many times after he complained of sexual harassment,"
(Pl.'s 56.1 Counterstmt. ¶ 30); and (5) "notified Plaintiff that
she had to watch him for his urine test," (Pl.'s 56.1 Counterstmt.
¶ 59).

The Court finds that Plaintiff has failed to raise
triable issues of fact regarding the existence of a hostile work
environment. The record does not indicate the number of times
Flynn allegedly referred to Plaintiff as "skinny boy," harassed
him with "looks and stares," or followed him around. Plaintiff
testified that Flynn's harassment began in 2009, (Pl.'s Dep. Tr.
114:14-116:5), concedes that her comments ceased in 2011, (Pl.'s
56.1 Counterstmt. ¶ 27), but alleges that after his meeting with
Siegel, Rowcroft, and Flynn in 2011, Flynn continued harassing him
by "looking" at him when he was wearing jeans or shorts, (Pl.'s
Dep. Tr. 169:20-170:9). Nevertheless, in the absence of any

---

[5] Plaintiff testified that in 2009, Flynn remarked on his "sexy legs." (Pl.'s Dep. Tr. 113:24-114:7.) However, Plaintiff's June 2011 complaint only refers to Flynn calling him "skinny boy." (See Def.'s Ex. H, Docket Entry 85-10.)

evidence regarding the frequency or duration of this behavior, a reasonable jury could not evaluate whether these comments were sufficiently pervasive.  See Jackson v. Citiwide Corp. Transp., Inc., No. 02-CV-1323, 2004 WL 307243, at *3 (S.D.N.Y. Feb. 17, 2004) (granting summary judgment on the hostile work environment claim and holding that "without any information as to frequency or severity or duration of the alleged stares, no reasonable jury could be expected to be able to evaluate whether these purported actions contributed to the altering of [Plaintiff's] conditions of employment").

    However, with respect to severity, the Court finds that Flynn's overtly sexual conduct--namely, the verbal remarks, looks and stares, following Plaintiff around, and incident in which she stared at Plaintiff's groin during his evaluation--while inappropriate and grossly unprofessional, were relatively mild. See Lewis v. City of Norwalk, 562 F. App'x 25, 28-29 (2d Cir. 2014) (affirming the grant of summary judgment to the defendant where the plaintiff alleged, inter alia, that the supervisor "sporadically" licked his lips and "leer[ed]" at him); Spina v. Our Lady of Mercy Med. Ctr., No. 97-CV-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003), aff'd, 120 F. App'x 408 (2d Cir. 2005) (holding that the supervisor's conduct in calling the plaintiff a bitch on two occasions, stating that she "looked good in tight pants," and complimenting her hair and eyes was not sufficiently

severe to establish a hostile work environment and the supervisor's yelling and staring at the plaintiff and following her "was similarly mild"). While Plaintiff may have subjectively felt uncomfortable as a result of Flynn's behavior, this conduct does not rise to the level of an objectively hostile work environment. See Figueroa v. Johnson, 109 F. Supp. 3d 532, 552-53 (E.D.N.Y. 2015), aff'd, 648 F. App'x 130 (2d Cir. 2016) (granting summary judgment to the defendant where the plaintiff alleged that during a five-year period, his supervisor "smile[d] at [him] and paid attention" on two or three occasions, "looked at him seductively and batt[ed] her eyes," on one or two occasions, and "briefly" placed her hand on his thigh on one occasion); Geller v. N. Shore Long Island Jewish Health Sys., No. 10-CV-0170, 2013 WL 5348313, at *7-8 (E.D.N.Y. Sept. 23, 2013) (granting summary judgment in favor of the defendant where the coworker drew a picture of a penis on a whiteboard, inappropriately touched the plaintiff's knee, and made approximately twenty remarks over a five-year period that included comments about the plaintiff's breasts); Nieves v. Distr. Council 37 (DC 37), AFSCME, AFL-CIO, No. 04-CV-8181, 2009 WL 4281454, at *6 (S.D.N.Y. Nov. 24, 2009), aff'd, 420 F. App'x 118 (2d Cir. 2011) (holding that the plaintiff's allegations that one or both of her co-workers, inter alia, told her that her clothes were sexy and her hair was beautiful, blew kisses at her and other employees, sent an inappropriate e-mail, and joked about sharing

a hotel room with her did not establish a hostile work environment).

While not dispositive, the Court notes that Plaintiff has not alleged that Flynn "touched [him] in a sexual or suggestive manner, and never asked [him] out or to engage in sexual acts with [her]." Cristofaro, 473 F. App'x at 30 (allegations that the supervisor, inter alia, "occasionally" remarked on the plaintiff's appearance, bet other employees about his ability to engage the plaintiff in sexually explicit conversation, and "briefly made contact with the side of [the plaintiff's] body while standing next to her," did not suffice to raise triable issues of fact as to the hostile work environment claim). See also Spina, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003) (noting that the supervisor "never touched plaintiff in a sexual manner, did not ask her to go out with him or engage in a sexual relationship, and never made any lewd gestures"). But see Desardouin v. City of Rochester, 708 F.3d 102, 105-106 (2d Cir. 2013) (denying summary judgment on the plaintiff's hostile work environment claim where her supervisor stated that "her husband was not taking care of [her] in bed" on a weekly basis for two to three months) (internal quotation marks omitted; alteration in original).

Moreover, while Plaintiff may have subjectively believed that Flynn's "several" invitations to exercise together at her home constituted sexual advances, the Court finds such remarks to

be facially neutral. See Lewis, 562 F. App'x at 28-29 (holding that "[t]he other facially sex-neutral incidents--invitations to join [the supervisor's] gym, invitations to have drinks with other co-workers, and discussions about [the supervisor's] personal life--even if they made [the plaintiff uncomfortable]" failed to establish a hostile work environment) (internal quotation marks and citation omitted). Similarly, the remaining conduct alleged by Plaintiff consists of isolated incidents that were not overtly sexual. "While facially neutral incidents may be considered among the totality of the circumstances . . . in any hostile work environment claim, there must be a circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Cristofaro, 473 F. App'x at 30 (internal quotation marks and citation omitted). Plaintiff has failed to establish that he was asked to drive a defective bus to the station and/or directed to drive his bus on the Southern State Parkway "because of [his] sex." La Grande, 370 F. App'x at 209. Parenthetically, Rice was also responsible for instructing Plaintiff to drive the defective bus, (Pl.'s Dep. Tr. 78:6-81:2), and dispatchers directed Plaintiff to take the Parkway (Pl.'s Dep. Tr. 67:3-68:20, Pl.'s 56.1 Counterstmt. ¶ 46).

    Additionally, the Court is not persuaded that Flynn's conduct in stating that she had to "watch" Plaintiff's drug test occurred because of Plaintiff's sex. Plaintiff testified at his

deposition that in October 2011, Flynn said she had to watch him to make sure that he provided the urine sample.[6] (Pl.'s Dep. Tr. 214:25-215:3.) Plaintiff alleges that when he brought this to Rice's attention, she said, "[i]t is [Flynn's] job as Safety Supervisor to make sure there is no cheating in the urine sample." (Pl.'s Dep. Tr. 215:25-215:4.) First, it is worthy of note that Plaintiff concedes Flynn did not ultimately observe his drug test. (Pl.'s Dep. Tr. 216:3-218:3.) Plaintiff requested that a man supervise his test and after Rice directed him to Human Resources, Plaintiff ultimately took the test in a mobile unit supervised by a man. (Pl.'s Dep. Tr. 216:16-217:24.) Second, while Flynn's behavior was certainly ill-advised, the record does not contain evidence that would enable a reasonable juror to conclude that this facially neutral incident was based on sex. Even to the extent that Flynn's remark could be construed as having sexual undertones--which Plaintiff does not allege--the Court finds that this incident does not push the totality of Flynn's conduct into the realm of a hostile work environment.

Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is GRANTED. The Court need not determine Defendant's Faragher/Ellerth defense in the

---

[6] It is unclear whether Plaintiff is alleging that Flynn indicated she needed to "watch" Plaintiff inside the bathroom or outside of the bathroom. (See Pl.'s Dep. Tr. 212:13-217:8.)

absence of any triable issues of fact regarding the underlying hostile work environment claim. (See Def.'s Br. at 7-11.)

III. Title VII Retaliation

To state a prima facie case for retaliation, the plaintiff must demonstrate: "(1) participation in an activity protected by federal discrimination statute; (2) the defendant was aware of this activity; (3) an adverse employment action; and (4) a causal connection between the alleged adverse action and the protected activity." Dall, 966 F. Supp. 2d at 192 (citations omitted).

The McDonnell Douglas burden shifting framework is utilized in analyzing a Title VII retaliation claim. Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). First, Plaintiff must demonstrate a prima facie retaliation claim. Id. At this stage, his burden is "de minimis" and the Court's role is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Id. (internal quotation marks and citation omitted). If the plaintiff states a prima facie case, "a presumption of retaliation arises" and the defendant must set forth a "legitimate, non-retaliatory reason for the adverse employment action." Id. (internal quotation marks and citation omitted). If the defendant meets that burden, "the presumption of retaliation dissipates, and the employee must show that retaliation was the 'but-for' cause of

the challenged employment action." Geller, 2013 WL 5348313, at *8
(quoting Univ. of Texas SW. Med. Ctr. v. Nassar, --- U.S. ----,
133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).

The parties do not dispute that Plaintiff engaged in
protected activity that Defendant was aware of by complaining about
Flynn's behavior in June 2011, August 2011, and February 2012.
Thus, the Court will address adverse employment actions and
causation in turn.

An adverse employment action, in the context of a Title
VII retaliation claim, is an action that "'could well dissuade a
reasonable worker from making or supporting a charge of
discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801
F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry.
Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed.
2d 345 (2006)). In White, the Supreme Court held that Title VII's
retaliation provision is broadly applicable to "'employer actions
that would have been materially adverse to a reasonable employee
or job applicant.'" Hicks, 593 F.3d at 165 (quoting White, 548
U.S. 53 at 57, 126 S. Ct. at 2409). The Second Circuit has
articulated several principles derived from the White decision:
(1) Title VII's anti-retaliation provision is broader than its
anti-discrimination provision and "'extends beyond workplace-
related or employment-related retaliatory acts and harm'"; (2) the
requirement that the plaintiff demonstrate "material adversity"

preserves the principle that Title VII does not create a code of general civility for the workplace; (3) although <u>White</u> sets forth an objective standard, "'context matters'"; and (4) allegations of retaliation must be considered "both separately and in the aggregate" in determining whether an adverse action occurred because "even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." <u>Id.</u> (quoting <u>White</u>, 548 U.S. at 67-69, 126 S. Ct. 2405).

The parties do not dispute that Plaintiff's placement on administrative leave and termination are adverse employment actions. However, Plaintiff appears to argue that he suffered the following additional adverse employment actions: (1) being directed to drive a defective bus, (2) being denied a fair investigation into his sexual harassment complaints, (3) Defendant's failure to remove Flynn as his supervisor, (4) increased supervision, and (5) interference with Plaintiff's attempts to secure employment following his termination. (Pl.'s Br. at 13-14.) The Court finds that these incidents do not constitute adverse employment actions, whether considered singularly or in the aggregate.

<u>First</u>, the parties do not dispute that Plaintiff ultimately did not have to drive the defective bus, despite Rice and/or Flynn's June 2011 directive. Plaintiff testified that a mechanic brought him a working bus and Plaintiff used the working

bus to transport his passengers back to their workplace. (Pl.'s Dep. Tr. 88:14-22.) The fact that Plaintiff's concerns were ultimately accommodated and he was not disciplined regarding this incident weighs against a finding that it would dissuade a reasonable employee from complaining about discrimination.

Second, Defendant's alleged failure to investigate is not an adverse action as it relates to the same complaints that Plaintiff alleges constitute protected activities. See Brayboy v. O'Dwyer, 633 F. App'x 557, 558 (2d Cir. 2016)("[a] failure to investigate can be considered an adverse employment action only 'if the failure is in retaliation for some separate, protected act by the plaintiff'") (quoting Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010)). Plaintiff's argument that Defendant's failure to remove Flynn as his supervisor constitutes an adverse action is another iteration of his argument regarding Defendant's alleged failure to investigate and fails for the same reasons.

Third, Plaintiff's "increased supervision" does not constitute an adverse employment action where, as here, the record does not indicate that the alleged increased monitoring was accompanied by any disciplinary action or other negative consequences. Davis v. N.Y.S. Dep't of Corr. Attica Corr. Facility, 110 F. Supp. 3d 458, 463 (W.D.N.Y. 2015) ("being subjected to increased supervision, where unaccompanied by a

disciplinary process, is not materially adverse for purposes of a retaliation claim"); Chacko v. Connecticut, No. 03-CV-1120, 2010 WL 1330861, at *13 (D. Conn. Mar. 30, 2010) ("[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences") (internal quotation marks and citation omitted).

Finally, the Court finds that Plaintiff has failed to establish that Defendant's alleged interference with Plaintiff's attempts to procure employment constitutes an adverse employment action. "A plaintiff can state a claim for retaliation where a previous employer gives a negative job reference, refuses to write a recommendation, or otherwise sullies her reputation, thereby damaging the employee's future employment prospects." Blutreich v. N. Shore-Long Island Jewish Health Sys., Inc., No. 13-CV-8583, 2015 WL 1515255, at *4 (S.D.N.Y. Apr. 2, 2015) (citation omitted). Nevertheless, while Plaintiff's burden at the prima facie stage is "de minimis," the record is bereft of any admissible evidence that Defendant made statements to Plaintiff's prospective employers. See Blutreich, 2015 WL 1515255, at *4. Plaintiff's argument appears to be solely based on his unsupported allegation that "BOCES is still retaliating against [him] by discouraging prospective employers from hiring Plaintiff by stating that he is a danger." (Pl.'s 56.1 Counterstmt. ¶ 125.) See Hicks, 593 F.3d at 167 ("a party cannot create a triable issue of fact merely by

stating in an affidavit the very proposition they are trying to prove"). The Court declines to find that Defendant's conduct constitutes an adverse action. Accordingly, Plaintiff's adverse employment actions consist of his placement on administrative leave and termination.

Plaintiff appears to argue that temporal proximity supports his prima facie case. (Pl.'s Br. at 14-15.)[7] The Second Circuit has held that "[w]hile temporal proximity must be very close, there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014) (internal quotation marks and citations omitted). Here, there was an approximately seven-month gap between Plaintiff's last sexual harassment complaint in February 2012, (see Pl.'s 56.1 Counterstmt. ¶ 102), and his placement on administrative leave in mid-September 2012.[8]

---

[7] The Court notes that Plaintiff's brief focuses on the previously noted incidents that do not constitute adverse employment actions. (See generally Pl.'s Br. at 13-15.)

[8] The temporal proximity between Plaintiff's 2011 sexual harassment complaints and his placement on administrative leave in September 2012 is, of course, even more attenuated.

Plaintiff relies on Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980), and argues that in that case, the Second Circuit held that an eight-month gap suggested a causal relationship. (Pl.'s Br. at 14-15.) While the Court acknowledges that "seven months is within the temporal range that [the Second Circuit] ha[s] found sufficient to raise an inference of causation," Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013), the Court finds that Plaintiff has failed to state a prima facie retaliation claim based on this seven-month time period in the absence of any evidence of retaliatory animus. See, e.g., Richardson v. Bronx Lebanon Hosp., No. 11-CV-9095, 2014 WL 4386731, at *12 (S.D.N.Y. Sept. 5, 2014) (holding that the plaintiff failed to establish causation based on a seven-month gap between the protected activity and the retaliatory act in the "absence of any evidence suggesting a causal connection"); Maxton v. Underwriter Labs., Inc., 4 F. Supp. 3d 534, 547 (E.D.N.Y. 2014) ("district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation") (internal quotation marks and citation omitted; collecting cases).

In any event, the Court notes that Defendant has proffered a non-retaliatory reason for its placement of Plaintiff on administrative leave, referral for Section 75 Charges, and

ultimate termination of Plaintiff. It is undisputed that on September 14, 2012, Fasano contacted the Police Department and subsequently, the Police Department contacted Rice and advised "they had received a report regarding threats made by Plaintiff." (Def.'s 56.1 Stmt. ¶ 85; Pl.'s 56.1 Counterstmt. ¶¶ 79, 85.) Thereafter, Plaintiff was referred for Section 75 Charges, and after a hearing, the hearing officer recommended that Plaintiff's employment be terminated. (Def.'s 56.1 Stmt. ¶¶ 90, 93-94.)

While Plaintiff alleges that Rice, Drucker, and Siegel "were initially the impetus in the police involvement by advising Ms. Fasano of Plaintiff's alleged threats," (Pl.'s 56.1 Counterstmt. ¶ 86), that assertion is unsupported and belied by evidence in the record. Fasano signed a Police Department Supporting Deposition that states, in relevant part: "I was seeing a patient by the name of Mihai Illinca [ ] during his therapy session he indicated to me that he had 2 guns at home and could take care of the problems himself. He also made other delusional statements which made me believe he is becoming increasingly unstable." (Def.'s Ex. AA, Docket Entry 85-29.) Officer Houghton of the Police Department testified at Plaintiff's Article 75 Hearing that on September 14, 2012, Fasano contacted him, stated she was alarmed at Plaintiff's comment during their session that he "owned two handguns and he could take care of the matters himself," and "identified [Plaintiff] as a bus driver for

B.O.C.E.S." (Houghton Tr., Def.'s Ex. Y, Docket Entry 85-27, 13:11-12, 14:16-19:7, 22:25-23:5, 28:2-8, 31:7-10.) Officer Houghton testified that he subsequently called BOCES and inquired about Plaintiff's demeanor during the last few weeks. (Houghton Tr. 18:16-19:17.) Accordingly, Defendant's motion for summary judgment on Plaintiff's Title VII retaliation claim is GRANTED.

IV. <u>FMLA Retaliation</u>

The plaintiff establishes a <u>prima facie</u> FMLA retaliation claim by demonstrating: "(1) [he] exercised rights protected under the FMLA; (2) [he] was qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."[9] <u>Serby v. N.Y. City Dep't of Educ.</u>, 526 F. App'x 132, 134 (2d Cir. 2013). FMLA claims are analyzed pursuant to the <u>McDonnell Douglas</u> burden-shifting framework. <u>Id.</u> The parties do not dispute the first three elements of Plaintiff's FMLA claim. However, Defendant argues that Plaintiff cannot establish a causal connection between his

_____

[9] The Second Circuit has not yet determined whether the Supreme Court's decision in <u>Nassar</u> is applicable to FMLA retaliation claims. <u>Graziadio v. Culinary Inst. of America</u>, 817 F.3d 415, 429 n.6 (2d Cir. 2016). This Court need not determine the appropriate standard of causation. As set forth <u>infra</u>, Plaintiff has failed to raise any genuine issues of material fact under the less stringent "motivating factor" standard.

FMLA leave and his placement on administrative leave and ultimate termination. (Def.'s Br. at 20-22.) The Court agrees.

Plaintiff argues that temporal proximity supports his FMLA claim. (Pl.'s Br. at 17.) Plaintiff alleges that he took an approximately thirty-day FMLA leave during June 2012, (Pl.'s 56.1 Counterstmt. ¶ 107); thus, there was an approximately three-month gap between Plaintiff's FMLA leave and his administrative leave. Additionally, Plaintiff avers that a September 10, 2012, email exchange between Rice and Drucker "about provoking Plaintiff to be insubordinate by asking him to do something they knew he would be opposed to--namely, driving on Southern State Parkway," also evidences Defendant's retaliatory intent. (Pl.'s Br. at 17-18.) Plaintiff also argues that the fact that the Article 75 Charges "dated back six months to almost a year prior" also demonstrates retaliatory animus. (Pl.'s Br. at 18.)

Assuming, arguendo, that Plaintiff has stated a prima facie FMLA retaliation claim, as set forth above, Defendant has proffered a legitimate, non-retaliatory reason for placing Plaintiff on administrative leave. However, the Court finds that Plaintiff has not met his burden of demonstrating pretext.

The Court is not persuaded that the email exchange between Rice and Drucker evidences retaliatory intent. On September 10, 2012, Rice wrote an email to Drucker stating:

> Hi Jeff, just a quick update.  Rachael set the
> groundwork for my meeting with Mihai Illinca.
> She asked him a few questions and then stated
> what we expected.  He refused to do what we
> wanted him to do because he will not drive on
> the Southern State Parkway.  How do you like
> that one?  FYI--he drove on it this summer
> (and last year for school).

(Pl.'s Ex. U, Docket Entry 88-21.)  Drucker responded as follows:
"Set up your meeting with him, but do it formally now.  No heads
up on it at this point.  Document the meeting that you directed
him to take that route and that he will be insubordinate if he
does not follow the directive."  (Pl.'s Ex. U.)  These emails do
not reference Plaintiff's FMLA leave or provide any indication
that Plaintiff's FMLA leave was connected to Rice and Drucker's
decision to schedule the meeting.  Even if Rice and Drucker were
"setting up" Plaintiff, as he alleges, (Pl.'s Br. at 18), there is
nothing in these emails or the record that connects Plaintiff's
FMLA leave to Rice and Drucker's alleged desire to have Plaintiff
deemed insubordinate.

Similarly, the fact that certain of the Article 75
Charges "date[ ] back six months to almost a year prior," (Pl.'s
Br. at 18), does not establish pretext.  While Plaintiff is correct
that certain of the Article 75 Charges relate to alleged misconduct
that occurred months before the September 2012 alleged threats,
none of these charges reference or otherwise relate to Plaintiff's
FMLA leave.  (See Def.'s Ex. EE, Docket Entry 85-33.)

Parenthetically, the Court is also not persuaded that the discrepancy between Rice's deposition testimony that she was not aware of Plaintiff's mental health provider and her September 20, 2012, email to Drucker referencing Fasano's name and telephone number establishes pretext. (See Pl.'s 56.1 Counterstmt. ¶¶ 113-114.) Even assuming, arguendo, that Rice was aware that Plaintiff was being treated by Fasano, Plaintiff has not proffered any evidence causally connecting Defendant's decision to place him on administrative leave to his stress-related FMLA leave.

Putting aside the question of whether the three-month gap between Plaintiff's FMLA leave and administrative leave is sufficiently close in time to raise an inference of causation, "[t]emporal proximity alone is insufficient to create a triable issue of fact as to pretext." Barletta v. Life Quality Motor Sales, Inc., No. 13-CV-2480, 2016 WL 4742276, at *5 (E.D.N.Y. Sept. 12, 2016). Accordingly, in the absence of any direct evidence of discriminatory intent, Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim is GRANTED.

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket Entry 83) is GRANTED.  The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


                              SO ORDERED.


                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Dated:     November   29  , 2016
           Central Islip, New York